AO-106 (Rev: 06/09)-Application for Search Warrant



## UNITED STATES DISTRICT COURT

for the

Northern District of Oklahoma

FILED

JAN 0 6 2023

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

| In the Matter of the Search of | | |
|---|---|---|
| *a gray AT&T Flip Phone Model# EA211101 IMEI* | ) | Case No. 23-mJ-17-SH |
| *#353786873043480, a gray Samsung, IMEI* | ) | |
| *#355563574707343, a green Apple iPhone, and a blue* | ) | **FILED UNDER SEAL** |
| *Motorola cell phone Currently Stored at Homeland* | ) | |
| *Security Investigations, Tulsa, Oklahoma* | ) | |

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment "A"

located in the __Northern__ District of __Oklahoma__, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| **21 U.S.C. §§ 846 and 841(b)(l)(A)(viii), and 18 U.S.C. § 2** | **Drug Conspiracy** |
| **21 U.S.C §§ 841(a)(l) and 841(b)(l)(A)(viii), and 18 U.S.C. § 2** | **Possession of Methamphetamine with Intent to Distribute** |

The application is based on these facts:

See Affidavit of TFO Marlin Warren, HSI, attached hereto.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

TFO Marlin Warren, HSI
*Printed name and title*

Sworn to before me via telephone.

Date: __1/6/23__

_____
*Judge's signature*

City and state:  Tulsa, Oklahoma

Susan Huntsman, U.S. Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

In the Matter of the Search of a
gray AT&T Flip Phone Model#
EA211101 IMEI #353786873043480, a
gray Samsung, IMEI
#355563574707343, a green Apple
iPhone, and a blue Motorola cell
phone Currently Stored at Homeland
Security Investigations, Tulsa,
Oklahoma

Case No. _____

FILED UNDER SEAL

### Affidavit in Support of an Application
### Under Rule 41 for a Warrant to Search and Seize

I, HSI TFO Marlin Warren, being first duly sworn under oath, depose and state:

### Introduction and Agent Background

1.     I make this affidavit in support of an application under Rule 41 of the
Federal Rules of Criminal Procedure for a warrant authorizing the examination of
property—an electronic device—which is currently in law enforcement possession,
and the extraction from that property of electronically stored information described
in Attachment B.

2.     I am a federal law enforcement officer as defined under Rule 41(a)(2)(C) and
am authorized to request this search warrant because I am a government agent who
is engaged in enforcing federal criminal laws and I am within the category of officers
authorized by the Attorney General to request such a warrant.

3.     In excess of ten (10) years, I have been a Task Force Officer with Homeland Security Investigations RAC Tulsa. I also possess CLEET certified peace officer status with the State of Oklahoma and currently employed, on a full-time status as a Deputy Sheriff, by the Tulsa County Sheriff's Office and have been so employed in excess of 22 years.

4.     I have been assigned to specialized positions such as, FBI Violent Gang Task Force, Immigration and Customs Enforcement, and the Tulsa County Drug Task Force. I have participated in over three hundred narcotics investigations and conducted over 2,000 interviews of individuals involved in criminal misconduct.

5.     In my capacity as a law enforcement officer, I have read over 3,500 law enforcement reports throughout the course of my career and I regularly receive and review intelligence updates in both digital and paper form from both state and federal sources.

6.     I am a CLEET certified instructor and have given presentations for law enforcement continuing education and/or in-service training for the Department of Homeland Security Investigations, the Association of Oklahoma Narcotics Enforcers, Tulsa County Sheriff's Office and various local law enforcement agencies.

7.     Because of being assigned to the above specialized positions, I have conducted numerous narcotics and smuggling investigations and have received specialized training in narcotics and smuggling investigation techniques. This training has been provided to your Affiant by Homeland Security Investigations, the Drug Enforcement Administration, Tulsa County Sheriff's Office, Tulsa Police

Department, HIDTA, EPIC, Desert Snow and the Oklahoma Bureau of Narcotics, as well as formal and informal training from more experienced narcotic investigators.

8.    I possess a bachelor's and a master's degree in Criminal Justice from Northeastern State University. Because of my participation in narcotic and smuggling investigations, numerous people have been successfully prosecuted and several assets have been successfully seized.

9.    I have submitted multiple prosecutions in both state and federal court related to organized illegal activity. In addition, I have collaborated with other investigative agencies including the Federal Bureau of Investigation, the Drug Enforcement Administration, Immigration and Customs Enforcement, Homeland Security Investigations (in over fifteen separate offices). These investigations have resulted in your Affiant travelling in an investigative capacity to New Mexico, Louisiana, Texas and multi jurisdictions across the state of Oklahoma

10.    I am familiar with the facts and circumstances of this investigation. The facts set forth in this affidavit are based on my personal observations, knowledge obtained from other law enforcement officers, my review of documents related to this investigation, conversations with others who have personal knowledge of the events and circumstances described herein, and a review of open-source information including information available on the Internet. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact I or others have learned during the course of this investigation.

11. Based on my training, experience, and the facts set forth in this affidavit, there is probable cause to believe that evidence of violations of 21 U.S.C. §§ 846 and 841(b)(l)(A)(viii), and 18 U.S.C. § 2 -Drug Conspiracy; and 21 U.S.C §§ 841(a)(l) and 841(b)(l)(A)(viii) and 18 U.S.C. § 2-Possession of Methamphetamine with Intent to Distribute, will be located in the electronically stored information described in Attachment B and is recorded on the device described in Attachment A.

### Identification of the Device to be Examined

12. The property to be searched is a **Gray AT&T Flip Phone (Model# EA211101, IMEI 353786873043480), a Gray Samsung (IMEI#355563574707343), a Green Apple iPhone, and a Blue Motorola cell phone,** hereinafter the "Devices." The Devices are currently located at Homeland Security Investigations—Property Room, 125 West 15th Street, Suite 500, in Tulsa, Oklahoma.

13. The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

### Probable Cause

14. On December 1, 2022, HSI Tulsa TFO Marlin Warren received information from HSI Los Angeles Border Enforcement Security Task Force (BEST) Special Agents that an individual inquired to have 4 concrete containers transported by semi-truck from Los Angeles, California. Two of the containers were destined for Atlanta, Georgia, and the other two containers were destined to Jennings, Oklahoma.

4

15.   HSI BEST Agents advised the subject in Los Angeles, California, who was wanting the containers transported to Oklahoma, is a large-scale drug trafficking target of BEST who works with Transnational Criminal Organizations to smuggle narcotics across the US-Mexico Border.

16.   HSI BEST Agents advised TFO Warren that on December 1, 2022, approximately 1030 hours, two of the containers were delivered to 130 Hannah Gwin Drive, Jennings, Oklahoma. A neighbor near 130 Hannah Gwin Drive reported that the concrete containers were suspicious and confronted the individuals involved at 130 Hannah Gwin Drive while the containers were being delivered. It was learned that the crane being used to off-load the containers was being rented for $500 per hour.

17.   Agents were informed the containers were stashed in the trees in attempt to camouflage or hide the containers. The containers appear to be commercial fuel storage containers. There does not appear to be any legitimate purpose for the containers at the residence to be searched, particularly with their concealment in the woods.

18.   Based on my training and experience, I know that cavities in these types of containers have been used to conceal large amounts of controlled substances to be trafficked into the United States. Once these types of containers are delivered for regional distribution, the controlled substances are removed, and processed for distribution of further transport.

19.   On December 2, 2022, at approximately 12:30pm, TFO Warren was notified that HSI Atlanta Agents conducted surveillance on the two concrete containers delivered to the Atlanta Area. One of the containers was delivered to a narcotic trafficking suspect that has been under investigation for several years.

20.   HSI Atlanta Agents stated to TFO Warren that during surveillance, individuals appeared to be manipulating the top of one of the containers to gain entry inside.

21.   TFO Warren was aware the Oklahoma Bureau of Narcotics currently had an open case involving the residence and occupants located at 130 Hannah Gwin Drive, Jennings, Oklahoma. TFO Warren contacted OBN Case Agent Jessi Robertson, and it was decided to place OBN Agents and HSI Agents in close proximity to the residence until a State Search Warrant could be obtained.

22.   On December 2, 2022, at approximately 4:00pm, OBN Agent Chris Cornwell advised the black Dodge Charger was leaving the residence. Agent Cornwell advised he observed the black Charger to be "bumper locked" on the rear of a dark colored Dodge Challenger both headed in tandem from the location.

23.   TFO Warren and TFO Tom Helm staged at approximately Highway 48 eastbound 412. TFO Warren and Helm observed the Black Charger pass the TFO's location on the rear end of a black Dodge Challenger. TFO Warren and Helm begin a follow to observe actions eastbound towards Sand Springs, OK.

24.   The Black Dodge Charger's license plate was covered by a tinted plate cover and was unreadable at distance. The Dodge Challenger had a paper tag that was flapping, and the tag numbers were not visible.

25.   During TFO Warren and Helm's follow, it was obvious the occupants in the Black Charger were escorting the Dodge Challenger, at times the black Charger was within a few feet of the Challenger traveling in upwards of 90 MPH.

26.   Numerous times, TFO's Warren and Helm would observe the Charger switch lanes and give a turn signal for the Challenger to switch lanes in manner of performing a blocking maneuver. Once the Challenger would maneuver to the lane directed by the Charger's turn signal, the Charger would switch back lanes and signal again and block for the Challenger to maneuver back to the lane the Charger wanted it to drive in.

27.   TFO Warren and Helm are experienced in this method of Drug transportation and have been involved with several Transnational Criminal Organizations (TCO) that use this escort method as a way to block or interfere to deter Law Enforcement from engaging with the load car but rather focusing on the follow car.

28.   Due to the above observations, (failing to signal in traffic, erratic, high speeds and following too closely) it was reasonable to TFO Warren and Helm to be confident these two cars were involved with some type of narcotics transport. TFO Warren and Helm notified Tulsa County Sheriff's Office Deputies Weston Edwards

and Daniel Gulley that the two vehicles were in Tulsa County eastbound 412 approaching Sand Springs making a mockery of the State traffic laws.

29.   At this time, Tulsa County deputies observed our travel. Tulsa County Deputy Daniel Gulley assisted Homeland Security Task Force Officers at 12900 W Hwy 412. When Deputy Gulley got behind the Black Dodge, Gulley observed the black Dodge Charger possessing a covering over the license plate that prevented Deputy Gulley from reading it.

30.   Deputy Gulley activated his emergency equipment and initiated a traffic stop. The vehicle came to a stop at approximately 9200 W Hwy 412. When the vehicle came to a stop, Deputy Gulley was then able to read the license plate (OK LFY257). Deputy Gulley contacted the driver, Abel FLORES, and passenger Jabier BUSTOS. On initial contact FLORES provided Deputy Gulley with an Oklahoma Identification Card and stated that his vehicle was insured but he did not have proof in his vehicle. A records check showed that Abel FLORES' Oklahoma Driver's License was revoked. Deputy Gulley took FLORES into custody for driving under revocation.

31.   During an inventory of the vehicle (OK LFY257) prior to tow, a clear crystal substance was located in the trunk of the vehicle in a black trash bag. A field test of the substance was presumptive positive for methamphetamine. The substance was collected for evidence.

32.   Four phones were found to be in the possession of FLORES and BUSTOS during the traffic stop. It was determined that BUSTOS possessed two phones: a

Gray AT&T Flip Phone Model# EA211101 IMEI 353786873043480, and Gray Samsung, IMEI#355563574707343. FLORES was found to be in possession of a Green Apple iPhone, and Blue Motorola cell phone.

33.   The "lead car" Dodge Challenger driven by Vanessa GARCIA-JIMENEZ was encountered by Tulsa County Deputies and was found to have over 200 pounds of methamphetamine after a Deputy performing back-up conducted a stop on the car Vanessa was driving.

34.   Subsequently, a search warrant was executed in Pawnee County from where all parties had left in which Over 50 pounds of methamphetamine was located along with 6 firearms.

35.   Based on the above information both FLORES and his passenger, Jabier BUSTOS, were taken into custody for trafficking in controlled drugs and traffic violations.

36.   TFO Warren has conducted surveillance on individuals involved in the drug trade, viewed SMS messages involving the sale of drugs, and participated in undercover hand to hand buys. Your affiant has interviewed individuals involved in the drug trade as well as spoke with other law enforcement officers and agents about the trafficking and sale of drugs. Through training and experience your affiant knows those involved in the drug trade have certain patterns or practices they follow and are not limited to the ones listed below:

37.   Individuals who sell or traffic drugs are secretive. They do not like to deal with people they do not know. Often, they will refuse to sell drugs to someone they

are not familiar with unless someone they know can vouch for that person's trustworthiness.

38. Often there is a hierarchy in these drug organizations and people working in them have a certain job or status.

39. Co-conspirators in the organizations must communicate with each other to perform their job function inside the organization. These communications include discussions pertaining to the sale or payment of drugs, arrangements to order more drugs or increase supply, the transportation or delivery of drugs, and the investment or distribution of proceeds obtained from the sale of drugs. Drug distributors and traffickers will change their method of operation to avoid detection by law enforcement. Their communications will often concern their relationships with financiers, manufacturers, importers, suppliers, traffickers, distributors, transporters, and consumers of drugs.

40. Cellular telephones are almost always used by drug distributors as a way to communicate. They will communicate by verbal conversations, digital text messaging, and/or sending photographs to one another. To avoid detection, drug distributors will often times speak in coded or vague messages. Sometimes the cellular telephone number they use listed in different individuals' name or they will frequently change phone numbers.

41. Those involved in the drug trade often times have a "street name" or moniker they go by which can make it difficult on law enforcement to identify them.

42.   Individuals who purchase drugs often communicate with the seller on their cellular telephone by an audio call or text message to obtain permission to meet the drug seller and arrange the purchase of drugs. Furthermore, high level drug distributors oftentimes maintain multiple cellular telephones or employ technology in order to avoid detection.

43.   Drug distributors will sometimes employ people to bring prospective buyers to them. As payment drug distributors will usually either pay them in cash or provide them with drugs. As with purchasers these employees often will use cellular phones as a way of communication to set up the drug purchase.

44.   Drug distributors or traffickers can go through a series of suppliers or middle-men that they use for redistribution. As the amounts of drugs and money increase so does the sophistication and means of concealment to avoid detection by law enforcement. These measures can include counter surveillance activities by the trafficker or employing additional accomplices to conduct the counter surveillance. Furthermore, higher levels of drug trafficking organizations have fewer associates. Much like the legitimate business world, large scale suppliers make fewer, albeit more voluminous, deliveries while street level or retail dealers rely on a larger number of customers on a frequent basis.

45.   Like any large business or industry, drug organizations are not based solely on one person. Through time different people may enter or leave the organization and it will continue to function unless it is detected and/or disrupted by law enforcement.

11

46.   Individuals involved in such illegal activity often use their vehicles, residences, safes, safe deposit boxes, storage units, "stash houses" (residences or businesses that drug traffickers use to store large sums of drugs and/or proceeds of drug sales), or residences of others to conceal financial records, cash, narcotics and such individuals attempt to conceal the illegally earned income by various means.

47.   It is common for those involved to use cell phones to communicate drop locations, destinations, police awareness, and in this case directions when acting as an escort to direct the lead car in case law enforcement encounters the follow.

48.   The Device is currently in the lawful possession of the HSI Tulsa. It came into the HSI Tulsa's possession in the following way: HSI TFO's Warren and Helm were nearby the traffic stop of FLORES and BUSTOS and instructed the Tulsa County Deputies to turn the phones over to HSI SA Dustin Carder.

49.   The Devices are currently in storage at HSI Tulsa, located at 125 W. 15th, Suite 500, Tulsa, Oklahoma 74119. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the Tulsa County Sheriff's Office and HSI Tulsa.

**Technical Terms**

50.   Based on my training and experience, I use the following technical terms to convey the following meanings:

   a.   Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data

communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This

13

storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using

14

specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be

used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term— IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the

16

structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

51.   Based on my training, experience, and research, I know that the Devices have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and a PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### Electronic Storage and Forensic Analysis

52.   Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

53.   I know that cellular telephones are often equipped with digital cameras and those phones possess the capability to transmit and/or store electronic images. I know that in many cases, cellular telephones maintain photographs of illegal activities, including 21 U.S.C. §§ 846 and 841(b)(1)(A)(viii), and 18 U.S.C. § 2 -Drug Conspiracy; and 21 U.S.C §§ 841(a)(1) and 841(b)(1)(A)(viii) and 18 U.S.C. § 2- Possession of Methamphetamine with Intent to Distribute. These photos are sometimes stored in their cellular phones and often are transmitted or sent from one electronic media device to another. I also know that cellular phones may also contain notes regarding potential illegal acts that are recorded by the subject who possesses

17

the electronics. Furthermore, I know that text messages and emails are often used by two or more persons to communicate information regarding illegal activities, between principals and co-conspirators of those crimes.

54.   I know that cellular telephones are utilized by the majority of individuals in the United States and have become a staple of communication between individuals using text messaging, visual and audible communications (telephone calls and FaceTime type communications) as well as applications like "Whatsapp" and "Threema." Additionally, individuals utilize their cellular devices to take pictures, keep notes, as a GPS (global positioning System) device, and even to conduct illicit or illegal activity. Communications on phones are kept for long periods and transferred from one phone to another when replaced. This is done through the use of Cloud storage and direct transfer conducted at the time of purchase or by the individual themselves. Individuals utilize this method as not to lose data that is stored on the phone such as contacts, photos, notes, and other important information to the individual. This data includes contacts used to conduct illegal activities to include 21 U.S.C. §§ 846 and 841(b)(l)(A)(viii), and 18 U.S.C. § 2 -Drug Conspiracy; and 21 U.S.C §§ 841(a)(l) and 841(b)(l)(A)(viii) and 18 U.S.C. § 2-Possession of Methamphetamine with Intent to Distribute.

55.   Cellular telephones are often used to facilitate offenses and allow criminals to maintain communication with each other before, during and after the commission of offenses. I am aware that cellular telephones have the capacity to store a vast amount of information, including but not limited to: telephone numbers, voice

18

messages, text messages, e-mail, photographs, videos, address books, records, phone call histories, contact and other information. This information may be contained on the cellular telephone.

56. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

 a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

 b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

 c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

 d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a

dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

57. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

58. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

59. *Methods of examination.* In conducting this examination, law enforcement personnel may use various methods to locate evidence and instrumentalities of the

crime(s) under investigation, including but not limited to undertaking a cursory inspection of all information within the Device. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with stored cellular device data, such as pictures and videos, do not store as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications associated with a cellular device, as it is impossible to know in advance all of the unique words or phrases investigative subjects will use in their communications. Consequently, often many communications in cellular device data that are relevant to an investigation do not contain any searched keywords.

### Conclusion

60.   Based on the information above, I submit that there is probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

61.   I request to be allowed to share this affidavit and the information obtained from this search with any government agency, to include state and local agencies investigating or aiding in the investigation of this case or related matters, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions from this matter.

Respectfully submitted,

Marlin V. Warren
Marlin Warren
Task Force Officer
Homeland Security Investigations

Subscribed and sworn to by phone on this 6th day of January, 2023.

SUSAN HUNTSMAN
UNITED STATES MAGISTRATE JUDGE

22

## ATTACHMENT A

### Property to be Searched

The property to be searched is a **Gray AT&T Flip Phone (Model# EA211101, IMEI 353786873043480), a Gray Samsung (IMEI#355563574707343), a Green Apple iPhone, and a Blue Motorola cell phone,** hereinafter the "Devices." The Devices are currently located at Homeland Security Investigations—Property Room, 125 West 15th Street, Suite 500, in Tulsa, Oklahoma.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**

### **Particular Things to be Seized**

All records on the Device(s) described in Attachment A that relate to violations of 21 U.S.C. §§ 846 and 841(b)(1)(A)(viii), and 18 U.S.C. § 2 – Drug Conspiracy; and 21 U.S.C §§ 841(a)(1) and 841(b)(1)(A)(viii) and 18 U.S.C. § 2 – Possession of Methamphetamine with Intent to Distribute.

1. Records relating to communication with others as to the criminal offense(s) listed above; including incoming and outgoing voice messages; text messages; emails; multimedia messages; applications that serve to allow parties to communicate; all call logs; secondary phone number accounts, including those derived from Skype, Line 2, Google Voice, and other applications that can assign roaming phone numbers; and other Internet-based communication media;

2. Records relating to documentation or memorialization of the criminal offense(s) listed above, including voice memos, photographs, videos, and other audio and video media, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos, including device information, geotagging information, and information about the creation date of the audio and video media;

3. Records relating to the planning and execution of the criminal offense(s) above, including Internet activity, firewall logs, caches, browser history, and cookies, "bookmarked" or "favorite" web pages, search terms that the user

entered into any Internet search engine, records of user-typed web addresses, account information, settings, and saved usage information;

4. Application data relating to the criminal offense(s) listed above;

5. Threatening communications related to the criminal offense(s) listed above;

6. All bank records, checks, credit card bills, account information, and other financial records. Records relating to financial data, to include bank records, checks, credit card bills, account information, and other financial records, electronically stored records showing proof of residence, proof of storage unit use and/or rentals, additional properties owned or documents reflecting stash houses, real estate transaction documents, rental agreements or documents, as well as automotive sale or purchase or financing documents, electronically stored documents purporting to indicate income or salaries received reflecting employment, hours worked, wages earned, withholdings, W-2 and W-4 forms, (blank or executed), state and federal tax returns or documents pertaining to the preparation thereof, electronically stored records showing secret clientele lists, business associates, and diversification of wealth, United States Currency, any other electronically stored tangible items evidencing the obtaining, transfer, secreting, and/or concealment of assets and/or money, electronically stored records, documents, receipts, and/or negotiable instruments which evidence the purchase of negotiable instruments and/or the

3

structuring of currency transactions to avoid the filing of currency transactions reports and/or the laundering of monetary instruments, electronically stored documents evidencing fruits, instrumentalities, monies, records, and notations, associated with the crime(s) listed above.

7. Evidence of user attribution showing who used or owned the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, saved usernames and passwords, documents, and browsing history;

8. All records and information related to the geolocation of the Device(s) and travel in furtherance of the criminal offense(s) listed above; and

9. All records and information related to the coordination, agreement, collaboration, and concerted effort of and with others to violate the criminal statutes listed above.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

4